[No. 34727. *En Banc.* February 18, 1960.]

THE STATE OF WASHINGTON, *Appellant,* v. PUBLIC UTILITY DISTRICT No. 1 OF CLARK COUNTY, *et al., Respondents.*[1]

*The Attorney General, Delbert W. Johnson* and *John K. Pain, Jr., Assistants,* and *Brockman Adams* and *Max R. Nicolai, Special Assistants,* for appellant.

*D. Elwood Caples* and *Bates & Burnett,* for respondents.

*Metzger, Blair & Gardner, amicus curiae.*

WEAVER, C. J.—The state of Washington appeals from a judgment of $20,999.69 entered in favor of respondent

[1]Reported in 349 P. (2d) 426.

Public Utility District No. 1 of Clark county, a municipal corporation.

The sole question is this: Is appellant or respondent liable for the cost of removal and relocation of certain public utility facilities, the removal and relocation of which resulted from the state's construction of a limited-access highway within the corporate limits of Vancouver, Washington?

It appears, from numerous maps in evidence, that the freeway, which begins at the northerly terminus of the interstate bridge at Vancouver and extends northerly through the city approximately one and one half miles, does not follow the course of any existing street. It does, however, cut across numerous city streets that extend from east to west. Thus, the freeway divides the city into two parts; communication between them by motor vehicle or pedestrial traffic is carried by four overpasses.

April 5, 1921, the city of Vancouver, pursuant to authority delegated to it by the state (RCW 80.32.010), granted a franchise to Northwestern Electric Company, a corporation, its successors and assigns. The franchise permitted the erection, construction, maintenance, and operation of an electric light, heat, and power distribution system "through, over, under and upon streets, alleys and highways" in the city of Vancouver for a period of fifty years.

The ordinance granting the franchise provided, among other things, that

"The City of Vancouver, by its properly constituted authorities shall have the right to cause said grantee, its successors or assigns to move the location of any pole or arc light whenever the removal thereof *shall be deemed for the public convenience,* and the expense thereof shall be paid by the said grantee, its successors or assigns.

". . .

"At all times the power and right reasonably to regulate in the public interests the exercise of the franchise and right so granted shall remain and be vested in the Council." (Italics ours.)

The ordinance also provided that

"Whenever it shall be necessary in grading or sewering,

*or in making any other improvements by the City of Van-couver,* in any street, alley or public highway, to remove any pole or poles belonging to said grantee, its successors or assigns, or on which any line or lines, wire or wires, of the said grantee, its successors or assigns, shall be stretched, or fastened, the said grantee, its successors or assigns, shall upon ten days' notice from the City of Vancouver, *or its properly constituted authorities,* remove such pole or poles, and if failing, neglecting or refusing to do so, the said City of Vancouver, by its properly constituted authorities, may remove the same at the expense of the said grantee, its successors or assigns." (Italics ours.)

August 9, 1923, the city granted a similar franchise to Portland Railway Light & Power Company, a corporation, upon substantially the same terms.

The respondent is the assignee and successor in interest of the two franchises.

Pursuant to a request of the state highway department, the city of Vancouver adopted a resolution on November 22, 1950, establishing a limited-access highway upon a portion of primary state highways Nos. 1 and 8 within the corporate limits. April 21, 1952, the city consented to and approved the access plans of the state highway department.

August 1, 1952, the Washington state highway commission,

". . . acting as the legal, implied and/or constructive agent of the City of Vancouver, and acting for the State of Washington in its sovereign capacity and as authorized by law, . . ."

requested respondent *to remove,* at its own expense, those facilities which interfered with the construction of the new limited-access highway.

The respondent

". . . refused to remove said facilities pursuant to said notice until and unless reimbursed by the plaintiff [appellant] for its costs and expenses incurred in effecting the removal and relocation of such facilities."

In furtherance of the public interest, the parties stipulated that respondent would perform the work of removal

and *relocation* made necessary by construction of the freeway,

".... without prejudice to their [respondent's] rights or claims for reimbursement for said removal and relocation as may be finally determined by the court."

The parties having stipulated that the cost of removal and relocation of the facilities was $20,999.69, the trial court entered judgment in favor of respondent for this amount.

The arguments of the parties (both buttressed by an abundance of legal authorities) "pass as ships in the night," for each is based on a different major premise.

Reduced to the lowest common denominator, respondent contends that it has been deprived of property ".... without just compensation having been first made ...." Washington constitution, Art. I, § 16 (amendment 9).

On the other hand, appellant contends (a) that respondent has not been deprived of property; (b) that a franchise from the city could not create vested rights against the state; (c) that franchise rights are qualified by the police power of the state; and (d) that utility corporations, at common law, must pay the cost of removal and relocation of their facilities from public highways when required by public convenience and necessity.

At this juncture, we call attention to the fact that the stipulation of the parties and the findings of fact of the trial court are silent on one point: There is nothing to indicate that respondent is now unable to furnish electrical energy to the entire city of Vancouver under the terms of its franchise, even though the city is divided by the freeway. The conclusion is inescapable—the situation is exactly as stipulated and found by the trial court—namely, this is a *removal* of public utility facilities from certain portions of public streets and a *relocation* of these facilities in order that the freeway could be built and the purpose of the franchises could be continued.

This determination having been made, the many authorities cited by the parties fall into a pattern.

In cases cited by respondent,[2] privately owned property was damaged by the action of the state or municipality. For this, the owners were entitled to damages. We do not find these cases apposite.

■ In the instant case, whether respondent's right to use the streets of the city of Vancouver for its electrical distribution system is termed a franchise or a privilege, it is subject to the express provision that it will remove and relocate these facilities "whenever the removal thereof shall be deemed for the public convenience" or "in making any other improvements by the City of Vancouver."

The great weight of authority supports the following rule:

"In the absence of an express and definite provision to the contrary, a utility company maintains its structures and rights in a public street subject to the paramount right of the city to use its streets for all proper governmental purposes. A grant, franchise, easement or other right accorded to a utility company by public authority, to maintain structures in public streets, is at all times subject to the police power of the sovereign, and unless expressly agreed to otherwise in the franchise, the company must, at its own expense, make such changes as the public convenience and necessity require, and it is bound to alter, remove, relocate, support and maintain a structure, when necessary for the city's carrying out a function in the interest of public health,

---

[2]*Ulery v. Kitsap County,* 188 Wash. 519, 63 P. (2d) 352 (1936) (Flooding of plaintiff's land by raising grade of county road);

*Aliverti v. Walla Walla,* 162 Wash. 487, 298 Pac. 698 (1931) (Damaging private property by operation of municipal sewage disposal plant);

*Conger v. Pierce County,* 116 Wash. 27, 198 Pac. 377, 18 A. L. R. 393 (1921) (Damaging plaintiff's property by changing current of a stream causing erosion);

*Great Northern R. Co. v. State,* 102 Wash. 348, 173 Pac. 40 (1918) (Damaging plaintiff's railroad tracks);

*Jacobs v. Seattle,* 93 Wash. 171, 160 Pac. 299 (1916) (Damaging plaintiff's property by operation of a municipal garbage incinerator);

*Seattle v. Columbia & Puget Sound R. Co.,* 6 Wash. 379, 33 Pac. 1048 (1893) (Destroying plaintiff's franchise for a right of way by raising grades of various streets.)

safety or welfare, and this is so, whether the city has fee title or a mere easement in the street." Rhyne, Municipal Law 512 (1957).

Many authorities are cited in support of this text. The same rule is stated in 25 Am. Jur., Highways, § 183; 18 Am. Jur., Eminent Domain, § 161.

In *Granger Tel. & Tel. Co. v. Sloane Brothers, Inc.*, 96 Wash. 333, 334, 165 Pac. 102 (1917), this court said:

" . . . It is true that the appellant [telephone company] had a right in the highway by reason of the franchise, but that right is necessarily a qualified right. It cannot be reasonably argued that the county authorities may grant the right to a public service corporation to occupy a highway to the exclusion of the public, or the exclusion of the right of the county authorities to improve the highway so that it may be used by the public. A franchise granted upon a highway such as this would necessarily be qualified by these rights. . . ."

Our disposition of the instant case is governed by the rationale of our decision in *Western Gas Co. v. Bremerton*, 21 Wn. (2d) 907, 909, 153 P. (2d) 846 (1944), wherein we said:

"The company's other contention is that it is entitled to 'damages' from the city to the extent of the expense incurred in re-laying its pipes when necessitated by changes in street grades made upon the authority of the city.

"The principle of *damnum absque injuria* is an ancient one. It is applicable here. The city is not guilty of any tort; no wrongful act is being done. The necessity and convenience of the public is being served. No property is taken; no title is disturbed. The authorities are well-nigh unanimous that in such a case the city has a paramount right to serve the public necessity and convenience without payment for individual losses resulting therefrom. Many roadside businesses have been destroyed by the rerouting of traffic or changes in the location of streets and highways.

"The paramount right of the city, in such a case as this, precludes the availability of any remedy to the company. *Damnum absque injuria.*"

Recent authorities recognize the rule that public utility companies operating under a franchise must bear the cost

of removing and of relocating their facilities, as it is made necessary by highway improvements. *State v. Southern Bell Tel. & Tel. Co.,* 319 S. W. (2d) 90 (Tenn. 1958), cert. denied 359 U. S. 1011 (1959); *City of San Antonio v. Bexar Metro. Water Dist.,* 309 S. W. (2d) 491 (Tex. 1958); *First Nat. Bank of Boston v. Maine Turnpike Authority,* 153 Me. 131, 136 A. (2d) 699 (1957); *Brunswick & Topsham Water Dist. v. W. H. Hinman Co.,* 153 Me. 173, 136 A. (2d) 722 (1957); *Opinion of the Justices,* 132 A. (2d) 613 (N. H. 1957); *Department of Highways v. Pennsylvania Public Utility Comm.,* 185 Pa. Super. 1, 136 A. (2d) 473 (1957), reversed on other grounds, 394 Pa. 31, 145 A. (2d) 538 (1958); *Southern Bell Tel. & Tel. Co. v. State,* 75 So. (2d) 796 (Fla. 1954); *Southern Bell Tel. & Tel. Co. v. Commonwealth,* 266 S. W. (2d) 308 (Ky. 1954); *Peoples Gas Light & Coke Co. v. Chicago,* 413 Ill. 457, 109 N. E. (2d) 777 (1952); *Public Water Supply Dist. No. 2 v. State Highway Comm.,* 244 S. W. (2d) 4 (Mo. 1951); *New York City Tunnel Authority v. Consolidated Edison Co.,* 295 N. Y. 467, 68 N. E. (2d) 445, rehearing denied, 70 N. E. (2d) 412, reargument denied 296 N. Y. 745, 70 N. E. (2d) 551 (1946); *State v. Marin Municipal Water Dist.,* 17 Cal. (2d) 699, 111 P. (2d) 651 (1941).

█ Finally, we give no weight to respondent's contention

" . . . that the removal of respondent's facilities from the path of the freeway was not required by the City of Vancouver in the improvement of any existing street or in any other activity connected therewith."

Respondent cites no authority (and we have found none) that applies one rule when an existing street is improved and another rule when an existing street is traversed by a new highway facility, as in the instant case. In either instance, if the public interest requires that public facilities be removed and relocated, the cost must be borne by the public utility.

Since respondent

" . . . readily concede[s] that the State's police power may not be bargained away and that franchises granted by the State or by municipalities as the State's delegate are

subject to reasonable regulation in the public interest, . . ."

we do not labor the point. As Judge Sullivan said in *First Nat. Bank of Boston v. Maine Turnpike Authority,* 153 Me. 131, 141, 136 A. (2d) 699 (1957),

" . . . whatever hierarchy of privileges in utility installations there may be, the exigencies of public travel and the police power are unremittingly paramount."

Our attention has been directed to Laws of 1959, chapter 330, § 3. It can have no bearing on the instant case, for, by its terms, it applies

" . . . only to relocation or removal of utility facilities required by state construction contracts which are advertised for bids by the state highway commission after June 30, 1959."

The judgment of the trial court should be reversed. It is so ordered.

ALL CONCUR.